## CONTINUATION OF APPLICATION FOR A SEARCH WARRANT

1. I, Larry Stewart, Jr., a Special Agent of the Federal Bureau of Investigation (FBI), Detroit Division, Michigan, have been an FBI Special Agent for more than 16 years. I am currently assigned to the Detroit Division of the FBI, Traverse City Resident Agency, located in Traverse City, Michigan. My duties include the investigation of various violations of federal criminal law, including matters involving white collar crime. The statements in this Continuation of Application for a Search Warrant are based in part on information provided by the Internal Revenue Service-Criminal Investigations Division, counsel representing the victim(s), records from the victim(s), my personal observations, and my experience and training as a Special Agent of the FBI. This Continuation of Application for a Search Warrant is intended to merely show there is sufficient probable cause for the requested warrant and does not set forth each and every fact known to me concerning this investigation.

2. I am a "federal law enforcement officer" within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure.

3. I submit this Continuation of Application in support of the government's application for the issuance of a criminal search warrant to search for electronic data in a cellular telephone, a computer, and two hard drives identified during my fraud investigation. These are more specifically described as: **1) a Samsung Galaxy S9+ cellular telephone with serial number R38K7097QJJ, (Subject Device 1); 2) a Microsoft Surfacebook (1713) computer with serial number 001430660357, (Subject Device 2); 3) a Western Digital My Passport 2TB external hard drive with serial**

**number WXM1A88AAX7H (Subject Device 3), and 4) a Western Digital My Passport 2TB external hard drive with serial number WXE1A48EEETO (Subject Device 4).** Hereafter, I will refer to these as the "Subject Devices."

4. As set forth below, I submit there is probable cause to believe that the Subject Devices contain evidence regarding violations of the federal wire fraud statute, 18 U.S.C. § 1343, in the Western District of Michigan.

## FACTS SUPPORTING PROBABLE CAUSE

5. From the mid-1970's until 2019, Stephen Lee Eiseler was employed by Cherry Central Cooperative (CCC) and assumed the position of President and CEO in June 2012. CCC is a consortium of cherry growers.

6. In 1992, CCC signed a software license agreement with Kirkey & Associates (Kirkey) to purchase software for $62,000, with an annual support payment of $9,300. This software was important to CCC because it tracked inventory and sales of the cherries handled by the consortium.

7. In 1998, CCC signed a contract with Kirkey to purchase a software upgrade for $25,400, with two annual support payments of $18,000.

8. In 2012, Eiseler obtained approval from CCC allowing him to hire a software company to develop a new program that would help track inventory and sales. Eiseler told CCC that the new software would cost approximately $500,000. Eiseler hired N2N, a software company in California, owned by Ernesto and Angelo Nardone.

2

Prior to this, the Nardones and N2N had purchased Kirkey and Associates, and owned the software CCC used.

9. Between 2012 and December 31, 2013, Eiseler transferred 3.5 million dollars to the Nardones and N2N. He did not get permission from CCC to exceed the budget it had given him, and did not tell CCC about it. However, during January, 2014, Eiseler proposed that CCC invest in N2N, but still did not reveal that he had already given the company 3.5 million dollars. In June 2014, CCC's Board agreed it would invest two million dollars into N2N.

10. However, CCC was unaware that between January 2014 and May 2015, Eiseler transferred more of its money to N2N. By May 2015, Eiseler had turned over 15 million dollars of CCC's funds to N2N. The CCC Board knew nothing about this and did not give Eiseler permission to make these expenditures.

11. In a June 2015 email from Eiseler to Nardone, Eiseler indicated the Board of CCC had only approved him to use $3 million and Roy Hackert, CCC's largest stakeholder, would be focusing on how CCC spent $15 million. A few minutes after Eiseler sent the email, he sent another email to Nardone indicating "…it may be important to develop a reason for the large advance in April." This refers to an April 9, 2015 transfer from CCC to N2N for $2,800,000.

12. CCC never got the new software it approved Eiseler to obtain for it. CCC has no information about why Eiseler transferred such a large sum of money to the Nardones, nor what they did with it.

13. However, CCC has discovered a close relationship between Eiseler's family and the Nardones. For example, during a January 2015 email exchange, Eiseler and Nardone discuss Jasyn Eisler (Jasyn), Eiseler's son. Jasyn was incarcerated and Eiseler asked Nardone to sign a letter Eiseler drafted for him. Highlights of this exchange appear below:

  a. In January 2015, Eiseler sent a draft letter on behalf of Jasyn to Nardone for the purpose of Nardone submitting it to a court where the letter states, "I have now known Jasyn, his family, and his kids for multiple years and can attest that he and his family are good people. Steve and Patty Eiseler (the parents of Jasyn) are the Godparents to our son. . . . I personally would hire him in my company and train him . . . ."

  b. On February 6, 2015, Nardone directed Ida Morrison, Human Resources Manager, to prepare to take Jasyn on at N2N, at a salary at $35,000 per year plus medical benefits.

  c. On February 9, 2015, Eiseler sent an email to CCC Controller Laura Reed and CCC Assistant Controller Robin Gloshen to "Pls wire $100k...thanks."

  d. On February 10, 2015, Gloshen responded, "Wired & released this morning." On the same day, Eiseler forwarded this email to Nardone who responded, "Thank you!!!".

  e. On February 11, 2015, Morrison sent an email to all the staff at N2N announcing Jasyn's hiring and position description.

      f. In February 2015, Jasyn was released from jail and hired at N2N at a salary of $35,000, with full benefits for his spouse and children.

14. Jasyn's job at N2N was described as being a client service representative for its account at CCC. CCC employees report that Jasyn has done virtually nothing since being hired.

15. In May 2018, Jasyn was arrested for DUI, child endangerment, and speeding. Nardone authored another letter, with edits from Eiseler, to the Kalkaska County Sheriff's Department. This letter requested Jasyn be allowed to participate in a work release program. Nardone wrote, "Jasyn has been working for me for the last 4 years and has become a critical member of my team and to the success of the company. I view Jasyn as a tremendous asset for our continued success and his is critical to the customers he supports on a daily basis."

16. In February 2019, CCC's board told Eiseler they would be looking for a replacement for him as their President and CEO. In May 2019, another person was hired as President and CEO (new CEO). Eiseler agreed to stay at CCC to help with the transition.

17. Eiseler told the new CEO that the company needed a software upgrade but they did not have the staff to do it. In June 2019, the new CEO confronted Eiseler about the N2N payments despite receiving no software upgrades from it. Eiseler did not provide a response.

18. In or about July 2019, CCC contacted Varnum, LLP, (the Law Firm) to conduct a financial investigation at CCC. This investigation uncovered the 15 million

dollars paid by CCC to N2N referred to above. The investigation also showed a large amount of unauthorized personal expenses charged by Eiseler to his company credit card.

19. CCC was not able to locate any record that Eiseler was disclosing to the Board any of the payments made to N2N, other than the initial request to spend $500,000 for a software upgrade and the later decision to invest two million dollars into N2N.

20. The only contract the internal investigation located between CCC and N2N regarding software upgrades was a Purchase Order (PO) dated July 25, 2011, in the amount of $557,500.00. The PO was never ratified by CCC's Board.

21. CCC did not have a formalized process in place at the time for wire transfers. In order to initiate these transfers, Eiesler would tell either Gloshen or Reed to transfer a specified amount of money to N2N. All wire transfers made to N2N were made from CCC's office in Traverse City, MI.

22. External auditors conducted an annual audit of CCC's books. The auditors located Promissory Notes showing a loan made to N2N from CCC for each year beginning in 2015 through 2019. Eiseler would tell the auditors that the note would be paid the following year and a new promissory note was prepared each year. The first note was dated April 15, 2015, for an amount of $1.75 million. Subsequent notes were as follows: April 15, 2016 - $4 million; April 15, 2017 - $3.3 million; April 15, 2018 - $3.3 million; and April 15, 2019 - $3.3 million. It is unclear how the loan figures were determined and CCC was not able to locate any record of repayments by N2N.

23. The disposition of the funds that were sent by Eiseler from CCC to N2N is unknown. It is only known that the funds went from CCC's bank account to N2N's bank account

24. During the investigation, an attorney of the Law Firm confronted Eiseler as to why he had transferred the large amount of funds to N2N without Board approval. Eiseler said he could not explain it.

25. The Law Firm provided the results of his investigation to CCC's board on September 10, 2019. The board terminated Eiseler's employment at CCC on September 11, 2019. Eiseler surrendered the Subject Devices at that time, which CCC had provided to him to perform his duties for the consortium. They have remained in the control of the Law Firm since that time.

26. I am aware though training and experience as an FBI Agent that criminals often utilize cellular telephones and computers to communicate during the planning, commission and aftermath of crimes. Criminals also store fruits of the crimes on devices such as external hard drives.

27. Based on the foregoing, I submit that there is probable cause to support a search of the Subject Devices for evidence of a fraudulent scheme to extract approximately 15 million dollars from CCC.

**ELECTRONIC STORAGE and FORENSIC ANALYSIS**

28. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been

viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

29. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICES were used, the purpose of their use, who used them, and when they were used. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICES because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be

merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

31. Based on the facts relayed in this Continuation, I submit that probable cause exists to believe that Stephen Lee Eiseler committed fraud in violation of 18 U.S.C. § 1341 in the Western District of Michigan. Based upon the forgoing, the undersigned respectfully submits there is probable cause to believe the contents of the above-named items as described in paragraph three of this Continuation will contain evidence

regarding the fraud. The undersigned therefore respectfully requests that the attached warrant be issued authorizing a search for the items listed in paragraph 3, above.